NOTICE
Decision filed 07/12/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190358-U

NO. 5-19-0358

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 11-CF-189 |
| | ) | |
| DAMONDROS JAMES, | ) | Honorable |
| | ) | Barry L. Vaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant did not demonstrate he received ineffective assistance of plea counsel where the record demonstrated that he understood the sentencing range and he presented no evidence to support his claim that he would have insisted on going to trial but for plea counsel's alleged deficiencies. The record is inadequate to allow us to consider the defendant's youth-based as-is constitutional challenge to his sentence where he presented no evidence in support of his claim other than his age. The trial court did not abuse its discretion in sentencing the defendant to 50 years in prison.

¶ 2   The defendant, Damondros James, was 18 years old when he and three other teenagers killed 75-year-old cab driver Charles Ellis during an attempted robbery. Two of the teenagers, including the defendant, were armed. The defendant pled guilty in a partially-negotiated plea agreement, pursuant to which the State agreed not to seek a 25-year-to-life sentence enhancement for causing a death by personally discharging a firearm (see 730 ILCS 5/5-8-

1

1(a)(1)(d)(iii) (West 2012)) in exchange for the defendant's plea and his agreement to cooperate in the prosecution of his three codefendants. In spite of this agreement, the defendant did not testify against his codefendants. The court sentenced the defendant to 50 years in prison, emphasizing the defendant's refusal to testify against his codefendants and evidence presented at the sentencing hearing showing that a bullet from his gun killed the victim. He subsequently filed a motion to withdraw his plea, which the court denied.

¶ 3    On appeal, the defendant argues that (1) the trial court abused its discretion in denying his motion to withdraw his plea because he received ineffective assistance of plea counsel due to counsel's alleged failure to adequately explain to him the possible sentencing ranges he faced and the requirement that he testify against his codefendants; (2) his 50-year sentence violates both the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) as applied to him; and (3) his sentence is excessive and constitutes an abuse of the trial court's discretion. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5    On May 31, 2011, 75-year-old cab driver Charles Ellis was found dead in his cab. Evidence produced during the defendant's sentencing hearing demonstrated that someone called for a cab using a phone belonging to Demondre Black, one of the codefendants in this case. A call was placed from Black's phone to the defendant's phone shortly thereafter. When Ellis arrived in his cab at the requested pick-up location, codefendants Christopher Wells and Mark Anthony Taylor got into the cab. At the direction of Wells and Taylor, Ellis drove them to Sixth Street and Herbert Street. There, Black and the defendant emerged from a hiding place and

2

ambushed the cab. Ellis attempted to flee. However, Taylor punched him in the face and two shots were fired, one of which struck him in the back. Ellis died of a gunshot wound.

¶ 6     Police recovered a .380 projectile from the post between the front and rear driver's side doors of Ellis's cab. Police found a loaded .380 pistol hidden under Wells's bed. The pathologist who performed an autopsy on Ellis recovered a single .22-caliber bullet fragment. The defendant admitted to police that he participated in the robbery attempt, but he denied carrying a weapon during the robbery or shooting Ellis. However, in separate statements, all three of his codefendants claimed that he fired a .22-caliber pistol—or, as they called it, a "deuce-deuce." Police also found four boxes of unfired .22-caliber ammunition under the defendant's bed. No .22-caliber weapon was ever recovered.

¶ 7     On June 1, 2011, the defendant was arrested and charged with first degree murder. The information alleged that the defendant shot Ellis during an attempted robbery, thereby causing his death, and that the defendant personally discharged a firearm during commission of the offense. The information stated that 20 years would be added to the defendant's sentence if the jury found that he personally discharged a firearm during the attempted robbery. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010). On June 23, the State returned a superseding indictment containing these same allegations.

¶ 8     On November 2, 2011, the State filed a notice that it intended to produce evidence that the defendant personally discharged the weapon that proximately caused Ellis's death. The notice indicated that if the jury finds this to be the case, the defendant would be subject to a sentence enhancement of 25 years to natural life. See *id.*

¶ 9     On that same date, this case came for what was scheduled to be the final pretrial conference. The defendant was then represented by public defender Bob Verhines. Verhines

3

indicated to the trial judge that, although the State had not previously provided him with a copy of its motion, he "knew it was coming." He stated, "I didn't know if this would require any further admonishment or not." The court then addressed the defendant. The court explained in detail that the State intended to present evidence showing that he personally discharged a firearm that caused the death of Charles Ellis and that if the jury finds this to be the case, he could receive an additional sentence of 25 years to life. The court further explained, "The jury would have to find beyond a reasonable doubt that what the State says happened on the notice did, in fact, happen." The court did not ask whether the defendant understood this admonishment.

¶ 10    Verhines noted that the trial was set for November 15. He asked the court to set another pretrial hearing for November 8. The court granted this request. At the November 8 hearing, Verhines requested a continuance based on his discussions with the defendant concerning the ramifications of the State's November 2 notice. The State did not object, and the court granted the request.

¶ 11    Subsequently, Verhines withdrew as counsel and the defendant retained Aaron Hopkins to represent him. The case was also transferred from the original trial judge, Judge Gamber, to Judge Vaughan.

¶ 12    In November 2013, Hopkins filed on behalf of the defendant a motion requesting an independent analysis of all the firearm-related evidence recovered in this case. That evidence included the .22-calliber bullet fragment recovered from Ellis's body during the autopsy, the four boxes of .22-caliber bullets found under the defendant's bed, the .380-caliber pistol found under Wells's bed, and a magazine and seven unfired .380-caliber cartridges. The defendant selected an independent expert located in Ft. Worth, Texas. The court granted the defendant's motion in April 2014.

4

¶ 13   In July 2014, the parties entered into a stipulation reflecting certain agreements they had reached related to the necessity of sending the firearms evidence to the defendant's independent expert via first-class mail. First, the parties agreed that it would be unnecessary for the State to establish a chain of custody during transportation of the evidence to and from Texas. Second, they agreed that the evidence was to be returned to the Mt. Vernon Police Department by July 29, and that any delay would be attributable to the defendant. Finally, the parties agreed that if any of the exhibits were lost or damaged in transit, the defendant would not object to the admission into evidence of photographs in lieu of the exhibits themselves. The .22-caliber bullet fragment removed during the autopsy was lost in transit on its way to the expert's office. The record does not indicate precisely when or where the evidence was lost, nor does it reveal whether the evidence was in the custody of the Mt. Vernon Police Department when this occurred.

¶ 14   In December 2014, the defendant entered into a plea agreement. At the plea hearing, the prosecutor described the plea agreement to the court as follows: The agreement called for the defendant to cooperate with prosecutors, including by giving testimony against his codefendants, if necessary. In exchange, the State would agree not to seek an enhanced sentence for use of a firearm. To that end, the State intended to dismiss the pending charges and file an amended indictment charging the defendant with a single count of felony-murder, which would not include any allegations that the defendant used a firearm. Pursuant to the agreement, the defendant would plead guilty to the amended indictment, and he would be subject to a sentencing range of 20 to 60 years.

¶ 15   After the Assistant State's Attorney described the agreement, the court addressed the defendant, asking, "Is that your understanding, Mr. James? This is what you're pleading to

5

today?" In response, the defendant said, "Yeah. I thought it was 20 to 40, though." At this point, the court took a recess to allow the defendant to confer with his attorney.

¶ 16    After the recess, the court explained to the defendant that the sentencing range for first degree murder is 20 to 60 years, but that an extended sentence of 60 to 100 years or a natural life sentence is possible if certain aggravating factors are present. However, the court indicated that the defendant would not be eligible for a natural life sentence and that the State did not intend to seek an "enhanced-term sentence." Asked to confirm that this was correct, the prosecutor replied, "That is correct, Your Honor. We are seeking only an open plea to a 20-to-60 range."

¶ 17    The court next explained that the State intended to withdraw its claim of a sentence enhancement based on the use of a firearm, which would have added 25 years to life to his sentence. Asked if he understood this, the defendant said, "Yes, sir." Asked if he was willing to plead guilty with this understanding, the defendant said, "Yeah."

¶ 18    At this point, the prosecutor reiterated that the plea agreement also required the defendant to cooperate with the State in the prosecution of his codefendants. The following colloquy then occurred:

> "THE COURT: *** You understand those additional requirements, Mr. James, that they are asking you to—or requiring you, as part of this plea agreement, to cooperate with law enforcement, give a statement, and testify truthfully, if required?
>
> THE DEFENDANT: Yes, sir."

¶ 19    The court next admonished the defendant about the rights he was giving up by pleading guilty, and the defendant indicated that he understood these rights. The court then asked the defendant if he felt that he had enough time to discuss the plea agreement with his attorney, to which the defendant replied, "Yes, sir."

6

¶ 20    The State then presented a factual basis for the plea, after which the court again advised the defendant that the sentencing range for murder was 20 to 60 years, and the defendant again indicated that he understood. Next, the court asked the defendant if he understood both that the plea agreement required him to cooperate and that his sentence could be anywhere from 20 to 60 years. The defendant once again indicated that he understood.

¶ 21    The following exchange then took place:

> "THE COURT: Has anyone led you to believe or promised you you would receive a certain sentence or be in a certain range?
>
> THE DEFENDANT: There wasn't no promises. I just thought wrong. I misheard him. I thought it was going to be 20 to 40, but he was saying 20 to 60 because it's Murder."

The court once again asked the defendant if he understood that the sentencing range was actually 20 to 60 years. In response, the defendant said, "Yes."

¶ 22    The court advised the defendant that he would also be subject to a three-year period of mandatory supervised release, which the defendant indicated he understood. The court accepted the defendant's plea.

¶ 23    The case against the defendant remained pending while the trials of his codefendants proceeded. In May 2016, the defendant filed a *pro se* motion to withdraw his guilty plea. In pertinent part, he asserted that he received ineffective assistance of plea counsel; that he felt pressured to accept the plea agreement and was rushed into making a decision; that he was misled by counsel; and that he did not fully understand the nature of the charge or the sentencing range.

¶ 24    The defendant subsequently withdrew this motion. At a February 2017 status hearing, defense counsel explained that the defendant wanted "more time to think about how he'd like to proceed," and that he was ready for the matter to be set for sentencing.

¶ 25    The court held a sentencing hearing on May 19, 2017. At the outset, the court addressed the defendant's expressed desire to withdraw his plea. Defense counsel clarified that although the defendant wanted to withdraw his plea "at some point," he was ready to proceed with sentencing. The court noted that if the defendant wanted to file either an appeal or any additional motions, he would have to do so within 30 days after the hearing. Counsel responded, "I so advised him, Your Honor, but I would ask that the court, once again, on this proceeding, advise him on the record of his rights in regard to that."

¶ 26    As evidence in aggravation, the State presented the testimony and victim impact statement of Ellis's son, Bobby Ellis. The State also presented the testimony of Captain Jeff Bullard, a Mt. Vernon Police Department detective involved in the investigation. Bullard's testimony provided evidence that the defendant fired the .22-caliber shot that killed Ellis. As we discussed earlier, that evidence included the separate statements of all three codefendants indicating that the defendant fired a "deuce-deuce" and testimony that police found four boxes of .22-caliber bullets under the defendant's bed. Bullard acknowledged that the three codefendants appeared to know each other better than they knew the defendant. He explained that they only knew the defendant by his nicknames, Man and Drosky. Bullard further acknowledged that although the defense had requested an independent analysis of the bullet fragment recovered during the autopsy, the testing never occurred because the fragment "fell out during the shipping process."

¶ 27　In mitigation, the defendant presented the testimony of his mother, Tanisha Henderson; his grandmother, Patricia James; and his great-aunt, Joyce Hicks. All three witnesses testified that the defendant did not have any behavioral problems growing up. James testified that the defendant helped take care of his siblings. Henderson testified that although the defendant had "typical" disputes with his siblings, he was often the "peacemaker" in the household.

¶ 28　Henderson further testified that the defendant was a good student in school, but because he had dyslexia, he sometimes needed extra time to read or take tests. She explained that the defendant required tutoring if he was struggling in any of his classes. She testified that he had issues with "understanding and comprehending certain things, or having to read it multiple times, or someone to read it to him in a different way for him to understand it better."

¶ 29　Asked by defense counsel if there was anything she wanted to tell the trial judge before he sentenced the defendant, Henderson stated, "I would just like to say that my son was not raised in a bad environment. He was raised in a loving home."

¶ 30　The court also considered information in the presentence investigation report (PSI). The PSI indicated that the defendant had no history of either delinquency proceedings or criminal convictions. The defendant reported to the probation officer who prepared the PSI that he was raised by his mother and grandmother, and that he did not experience any abuse. The defendant also reported that he had no mental health issues and no issues with drug or alcohol abuse, although he acknowledged occasional use of alcohol and marijuana. The defendant's academic records and school disciplinary records were attached to the PSI. The academic records showed that the defendant did poorly in school, obtaining a grade point average of 1.952. However, records also showed that the defendant left school and obtained his general equivalency diploma (GED) prior to his scheduled high school graduation date. The disciplinary records indicated that

9

the defendant had numerous disciplinary reports. Most were for tardiness, truancy, or use of electronic devices during class. However, there was one report for fighting with another student, one for throwing rocks at other students, and one for pouring a glass of juice over a classmate's head.

¶ 31    After hearing arguments from the parties and a statement in allocution from the defendant, the court ruled from the bench. As factors in mitigation, the court found that the defendant lacked a criminal history (see 730 ILCS 5/5-5-3.1(a)(7) (West 2016)) and that he had obtained his GED. As factors in aggravation, the court found that the defendant's conduct caused serious harm that the defendant should have contemplated (see *id.* § 5-5-3.2(a)(1)); the defendant intended to be compensated for his conduct in the form of taking money from Ellis during the robbery (see *id.* § 5-5-3.2(a)(2)); the victim was over 60 years old (see *id.* § 5-5-3.2(a)(8)); and a lengthy sentence was necessary to deter others (see *id.* § 5-5-3.2(a)(7)).

¶ 32    The court considered the State's argument that the crime was accompanied by brutality and wanton cruelty. In supporting this argument, the prosecutor relied on evidence Ellis was punched in the face hard enough to cause his dentures to fall out. The court initially stated that it did not find this factor to be applicable, explaining that violence is inherent in the crimes of murder and robbery, and finding that this case did not involve any more violence than what is inherent in the offenses. However, the court noted that it could consider these facts, but would give them "little weight."

¶ 33    Finally, the court noted that although the defendant expressed remorse, he did not testify against his codefendants as he was required to do under the plea agreement. The court sentenced the defendant to 50 years in prison. The court then admonished the defendant concerning his appeal rights and his right to file a motion to withdraw his plea.

¶ 34    In June 2017, the defendant filed another *pro se* motion to withdraw his plea, asserting that plea counsel Hopkins provided erroneous advice. The court appointed attorney Edward Veltman to represent the defendant. Veltman subsequently filed a certificate of compliance with Illinois Supreme Court Rule 604(d)  (eff. July 1, 2017) and a motion to amend the defendant's motion to withdraw the plea to include a request to reconsider his sentence.

¶ 35    In May 2018, the court held a hearing on the defendant's motion. The defendant was the only witness to testify at the hearing. When asked if he remembered the nature of the plea agreement, the defendant replied, "My attorney, Mr. Hopkins, he never fully explained the nature of it." The defendant testified that he pled guilty anyway because his trial was set for the following week and he did not believe Hopkins was prepared for trial. He did not explain why he thought Hopkins was not prepared. According to the defendant, Hopkins told him that he would be able to withdraw his plea within 30 days if he claimed that he was misled. The defendant further testified that Hopkins told him that Judge Vaughan was "predictable" and would likely impose a sentence of 20 to 25 years. The defendant acknowledged that he told Judge Vaughan that he had enough time to consult with his attorney prior to entering his plea. When asked why, he said, "I was just answering how my attorney wanted me to answer the question."

¶ 36    On cross-examination, the defendant acknowledged that during the plea hearing, he indicated to Judge Vaughan that he understood what the agreement entailed. When asked to acknowledge that he did have some understanding of the agreement, the defendant responded, "When he came to the sentencing part, that's one of the things that I kind of had an understanding of, but all around, no, I didn't." The defendant further testified that he did not want to plead guilty, and that he did so only because he did not believe Hopkins was prepared for trial and because Hopkins misled him. When asked to specify what Hopkins misled him about,

11

the defendant replied, "Pretty much everything that I put into my motion to withdraw my guilty plea. Everything that he was telling me was like misleading ***." Asked if Hopkins misled him about the sentencing range, the defendant testified that Hopkins told him that the State would not recommend more than 40 years.

¶ 37   The defendant further testified that he told Hopkins that he did not want to testify against his codefendants. According to the defendant, Hopkins told him that it was "not important because [he was] not a key witness in the case." He acknowledged that providing testimony "was part of the plea," but stated, "that's not what I wanted to do."

¶ 38   The defendant also testified that he wanted Hopkins to file a motion to suppress "the bullet that was found," but that Hopkins did not want to do so "because he didn't want to make the police department look bad for losing the evidence." The defendant acknowledged that this explanation made no sense, but he insisted that it is what Hopkins told him. We note that the defendant's first attorney, Verhines, indicated at a status hearing in 2011 that he had looked into filing a motion to suppress that evidence but found no basis for doing so. The evidence was lost in transit when it was sent to the defendant's expert witness more than two years later.

¶ 39   Finally, the prosecutor asked the defendant whether he was lying to the court when he said that he understood the plea agreement and wanted to pursue it. He replied, "I would not say it was lying, but—I did tell [the judge] that, but I didn't know how to go about it."

¶ 40   In explaining his ruling from the bench, Judge Vaughan recalled that at the plea hearing, the court took more than one recess to make sure the defendant understood the sentencing range of 20 to 60 years. He further recalled questioning the defendant at length about his understanding of the fact that he could receive a sentence anywhere within that range. Judge Vaughan further recalled that "the State was probably going to recommend a lower sentence" if the defendant

12

cooperated with prosecutors in the trials of his codefendants even though the plea agreement did not require this. He noted, however, that this matter was not addressed in the transcription of the plea hearing.

¶ 41    Judge Vaughan further recalled that the defendant filed multiple *pro se* motions to withdraw his plea while this matter remained pending. Judge Vaughan noted that he repeatedly asked at status hearings why those motions had not been set for hearing, and he was repeatedly told that the defendant was waiting to see whether he would be required to testify against his codefendants before proceeding on his motions. He concluded by stating that he believed the defendant had been given "every opportunity" to say that he felt pressured into pleading guilty or that he did not understand the sentencing range he faced.

¶ 42    Veltman presented a brief argument in support of the defendant's motion to reconsider his sentence. He urged the court to review the PSI again and to consider evidence that the defendant had completed several courses available to him in prison. He argued that the defendant's sentence was excessive because the defendant was very young at the time of the offense and he had no prior criminal history. In addressing these arguments, Judge Vaughan stated that he believed that the defendant's 50-year sentence was appropriate because the murder occurred during the commission of another crime and because it was the defendant who personally fired the shot that killed Ellis.

¶ 43    The court entered an order denying the defendant's motion after the hearing. The defendant appealed that ruling four days later. This court dismissed the appeal due to Veltman's failure to fully comply with Rule 604(d). We remanded the case to the trial court for compliance with that rule.

¶ 44    On remand, the trial court appointed attorney Letisha Luecking to represent the defendant. In April 2019, Luecking filed on the defendant's behalf a motion to withdraw his plea or reconsider his sentence. In support of the defendant's request to withdraw his plea, he alleged that Hopkins urged him to plead guilty because the State wanted a plea deal to avoid making the Mt. Vernon Police Department "look bad" for losing evidence. He further alleged that Hopkins erroneously advised him that the State would not recommend a sentence of more than 40 years and that the trial judge was predictable and would likely impose a sentence of 20 to 25 years. The defendant acknowledged that plea counsel advised him that he would face a sentence of 45 years to life if he went to trial, but he alleged that counsel did not advise him that this sentencing range only applied if the jury found beyond a reasonable doubt that he personally discharged a firearm. He further alleged that when he told Hopkins that he did not want to testify against his codefendants, Hopkins advised him that he was unlikely to be called to testify because he was not an important witness. Finally, the defendant alleged that he was confused about the charge and the potential sentences. He asserted that because he was dyslexic, he needed extra time to understand these things.

¶ 45    In support of his request to reconsider his sentence, the defendant argued that the trial court improperly considered evidence that the defendant was the shooter as a factor in aggravation where no such allegation was included in the factual basis presented at the plea hearing. He further argued that the court also improperly considered evidence that Ellis was punched in the face and evidence that his dentures fell out where there was no evidence that the defendant was responsible for this. Finally, the defendant argued that his *de facto* life sentence was unconstitutional as applied to him because he was only 18 years old when the murder occurred, he showed remorse for his crime, and he stated that he participated in the robbery and

14

murder only because he fell in with a bad crowd. In support of his constitutional claim, the defendant pointed to articles and studies detailing recent developments in brain science indicating that the brains of individuals between 18 and 25 years of age are still developing.

¶ 46    The matter came for a hearing in August 2019. Hopkins testified concerning his representation of the defendant in this matter. Asked if he recalled the defendant stating during the plea hearing that he was confused concerning the sentencing range, Hopkins replied, "I do recall that there may have been a break at one point and time in order [for the defendant] to have a meeting with myself. The substance of that, I can't recall at this point." Hopkins further testified that he was aware that the defendant had dyslexia. Asked if he took "any special precautions" or treated the defendant differently from other clients, Hopkins replied, "I didn't do anything extra ordinary with Mr. James, no."

¶ 47    On cross-examination, Hopkins testified that although he did not recall the specifics of his interactions with the defendant, his general practice was to read police reports, plea agreements, and any other relevant documents to his clients and to "go over all aspects" of these documents. If a client indicated that he did not understand anything, Hopkins's practice was to take whatever time was necessary to be sure the client understood.

¶ 48    Hopkins denied telling the defendant that he should plead guilty rather than filing a motion to suppress evidence because such a motion would make the Mt. Vernon Police Department look bad. He also denied telling the defendant that Judge Vaughan was likely to give him a low sentence. Hopkins recalled that the defendant was "somewhat apprehensive about" testifying against his codefendants, but he did not recall the defendant refusing to testify. Hopkins denied advising the defendant he would not have to testify, but he did advise the defendant "that the odds were not one hundred percent that he would have to testify."

15

¶ 49    On redirect examination, Hopkins testified that he explained to the defendant how a sentencing hearing works, including the fact that the judge would consider aggravating and mitigating factors. He explained to the defendant that the plea agreement "involved the removal of all enhancements."

¶ 50    The defendant's grandmother, Patricia James, testified that she attended most of the defendant's court hearings during the plea proceedings, and she believed that the defendant did not understand what was going on. Asked to explain why, she testified, "I felt that because he never been in a situation like that before. It was very confusing to him."

¶ 51    In ruling from the bench, Judge Vaughan recalled that during the plea hearing, the defendant expressed some confusion regarding the sentencing range and that the court took a recess of approximately 15 to 20 minutes to allow the defendant to consult with his attorney on this question. Judge Vaughan further recalled that when he asked the defendant whether anyone had promised him that the sentence would be within a specific range, the defendant replied, "There wasn't no promises. I just thought wrong. I misheard him. I thought it was going to be 20 to 40, but he was saying 20 to 60." Judge Vaughan explained that this response made it clear to him that the defendant understood that the sentencing range was 20 to 60 years.

¶ 52    The court next heard argument from counsel on the motion to reconsider the defendant's sentence. Luecking's arguments in support of the defendant's request to reconsider his sentence were identical to those she raised in the motion she filed on his behalf. In ruling on the motion, Judge Vaughan emphasized that in sentencing the defendant, he did take into account the defendant's lack of a criminal history as a factor in mitigation. He also emphasized that the evidence presented at the sentencing showed that the defendant's gun was the gun that caused Ellis's death and that the defendant did not cooperate with prosecutors. In light of these two

16

factors, Judge Vaughan believed the defendant's 50-year sentence was appropriate. The court therefore denied the defendant's motion. This appeal followed.

¶ 53                                    II. ANALYSIS

¶ 54    The defendant argues that the trial court abused its discretion in denying his motion to withdraw his guilty plea. He claims that he received ineffective assistance from plea counsel. The defendant also challenges his sentence on two bases. Pointing to recent caselaw addressing the constitutional limitations on the sentencing of juveniles and young adults, he argues that a 50-year *de facto* life sentence is unconstitutional as applied to him. Alternatively, he argues that his sentence was excessive and constituted an abuse of the trial court's discretion. We will consider these arguments in turn.

¶ 55                    A. Ineffective Assistance of Plea Counsel

¶ 56    The defendant first argues that the court should have granted his motion to vacate his plea because he received ineffective assistance of plea counsel and the record does not establish that he fully understood the applicable sentencing range. We disagree.

¶ 57    A defendant does not have an absolute right to withdraw his guilty plea. *People v. Edmonson*, 408 Ill. App. 3d 880, 884 (2011). However, a defendant should be allowed to withdraw his plea if it was not entered voluntarily or with full knowledge and understanding of the consequences of pleading guilty. *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 15. A defendant's plea cannot be voluntary and knowing unless the defendant received effective assistance of counsel during the plea proceedings. *Id*. ¶ 16.

¶ 58    We evaluate claims of ineffective assistance of plea counsel using the two-part test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *Boyd*, 2018 IL App (5th) 140556, ¶ 16. Under that test, a defendant must demonstrate

17

both that plea counsel's performance was objectively unreasonable and that he was prejudiced by counsel's mistakes. *Edmonson*, 408 Ill. App. 3d at 884 (citing *Strickland*, 466 U.S. at 687-88). To establish prejudice in the context of a claim of ineffective assistance of plea counsel, the defendant must demonstrate a reasonable probability that if not for counsel's mistakes, he would have insisted on going to trial rather than pleading guilty. *Boyd*, 2018 IL App (5th) 140556, ¶ 18. A bare allegation that he would have done so is not sufficient. Instead, the defendant must show that rejecting the plea would have been rational under the circumstances. *Id*. The defendant must satisfy both parts of the *Strickland* test to prevail on his claim. *Id.* ¶ 19.

¶ 59    A defendant seeking to withdraw his guilty plea bears the burden of establishing that he should be allowed to do so. *Edmonson*, 408 Ill. App. 3d at 884. We will reverse the trial court's ruling on a motion to withdraw a plea only if we find that the court abused its discretion. *Boyd*, 2018 IL App (5th) 140556, ¶ 13.

¶ 60    In support of his claim that plea counsel provided ineffective assistance, the defendant relies heavily on his own allegations and testimony. He asserts that he did not fully understand the sentencing range he faced pursuant to the plea agreement, the sentencing range he would have faced if he had rejected the plea offer and insisted on going to trial, the fact that the court would consider aggravating factors during sentencing, or the fact that the plea agreement required him to testify against his codefendants. He also emphasizes aspects of attorney Hopkins's testimony during proceedings on remand. Specifically, he points to Hopkins's admission that he did not remember details of his dealings with the defendant and Hopkins's testimony that he did not treat the defendant differently than other clients even though he was aware that the defendant was dyslexic. The defendant argues that his dyslexia required Hopkins

18

to spend extra time with him and that the record does not adequately reflect that he fully understood the sentencing range. We are not persuaded.

¶ 61    We first address the defendant's general claim that Hopkins was required to spend extra time explaining things to him because his dyslexia made it harder for him to understand complex topics. We first note that although, as the State points out, dyslexia is a learning disability that primarily impacts reading, it can also impact the ability to understand oral communication. See Free Medical Dictionary by Farlex, https://medical-dictionary.thefreedictionary.com/Dyslexia (last visited May 13, 2021) (defining dyslexia as "a learning disorder characterized by difficulty in processing words into meaningful information" that "is most strongly reflected in difficulty learning to read"). Here, the defendant presented very limited evidence concerning the impact dyslexia had on him. Most of his mother's limited testimony on the subject related to difficulties the defendant had with reading. However, assuming that the defendant also had difficulty understanding verbal communication, he failed to establish that Hopkins did not adequately explain things to him. Hopkins specifically testified that if any of his clients did not understand something, he took the time needed to explain it to them. This is precisely what the defendant's mother's testimony indicates was necessary for the defendant.

¶ 62    There are numerous specific aspects of the defendant's plea that he claims he did not understand. First and foremost, he claims he did not understand the sentencing range. Earlier in this order, we discussed what took place at the plea hearing in detail. As we stated then, the defendant initially indicated he thought the sentencing range was 20 to 40 years, after which the court took a recess to allow the defendant to confer with his attorney. After that recess, the court advised the defendant five times that he faced a sentencing range of 20 to 60 years, and each time, the defendant indicated that he understood. At one point, the defendant stated that although

19

he misheard his attorney earlier, he knew that the range was 20 to 60 years. The trial court expressly found that this statement indicated that the defendant understood the sentencing range. We agree with that assessment.

¶ 63    We recognize that the defendant testified at the May 2018 postplea hearing that he only told Judge Vaughan he understood the sentencing range because Hopkins told him that the sentencing hearing was not the appropriate time to raise any of his concerns. However, the trial court was not required to find this testimony credible. See *People v. Glover*, 2017 IL App (4th) 160586, ¶ 28 (explaining that a trial court's determinations concerning witness credibility are entitled to great deference by courts of review). Moreover, we find that the defendant's claim is contradicted by the fact that he did more than answer affirmatively when asked whether he understood the sentencing range; he also told Judge Vaughan, unprompted, that the sentencing range was 20 to 60 years. We agree with the trial court that this statement provided strong evidence that the defendant knew that he faced a sentence of anywhere from 20 to 60 years. It is also worth noting that even at the postplea hearing, the defendant appeared to acknowledge that he understood the sentencing range when he testified, "When he came to the sentencing part, that's one of the things that I kind of had an understanding of." We find that the record demonstrates that the defendant understood the sentencing range.

¶ 64    The defendant also contends that he did not fully understand the sentencing range he would have faced had he not pled guilty. More precisely, he claims that although Hopkins told him he faced a sentence of 45 years to natural life in prison if he did not accept the plea offer, Hopkins failed to explain that he would only face this sentencing range if a jury found beyond a reasonable doubt that he fired the shot that killed Ellis. Neither Hopkins nor the defendant

testified concerning their discussions of this issue. Thus, the record does not affirmatively rebut this claim.

¶ 65    However, we reject the defendant's claim for two reasons. First, as we have already stated, it was the defendant's burden to demonstrate that his motion to withdraw his plea should be granted. See *Edmonson*, 408 Ill. App. 3d at 884. The defendant did no more than present a bare allegation that Hopkins failed to adequately explain the sentence enhancement. Moreover, the defendant's first attorney, Verhines, indicated at a hearing that he discussed with the defendant the ramifications of the State's intent to seek this sentence enhancement, and the defendant does not even allege that Verhines failed to explain it to him adequately.

¶ 66    Second, to prevail on a claim of ineffective assistance of plea counsel, the defendant must also demonstrate that, but for counsel's alleged mistake, he would not have pled guilty and would instead have insisted on going to trial. *Boyd*, 2018 IL App (5th) 140556, ¶ 18. To make this showing, the defendant must present more than a bare allegation (*People v. Brown*, 2017 IL 121681, ¶ 47) or his own self-serving testimony (see *People v. Hale*, 2013 IL 113140, ¶ 18). Rather, the defendant must show that it would have been rational for him to insist upon going to trial under the circumstances. *Boyd*, 2018 IL App (5th) 140556, ¶ 18.

¶ 67    Here, there is no question that the maximum sentence the defendant could have faced had he rejected the plea offer and insisted on going to trial (natural life in prison) was harsher than the maximum sentence he faced pursuant to the plea deal (a term of 60 years). Further, the likelihood that the defendant would have received a sentence lower than 45 years had he not accepted the plea deal was minimal. Strong evidence showed that the defendant fired the shot that killed Ellis. Although the bullet fragment removed during the autopsy was lost in transit on its way to the Texas laboratory of the independent expert selected by the defendant, there is no

21

reason the State would not have been able to admit into evidence the pathology report indicating that a .22-caliber bullet fragment was recovered during the autopsy. We note that the record does not indicate whether any other evidence was lost in transit on the way to the defendant's expert—such as the ammunition found under the defendant's bed. However, the defendant stipulated that if any of the evidence sent to his expert was lost or destroyed in transit, he would not object to the admission of photographs in lieu of the actual exhibits. In addition, the State could have presented the testimony and/or the police statements of the defendant's three codefendants indicating that he fired a .22-caliber pistol. In the face of this evidence, we do not believe the defendant can show that it would have been rational for him to reject the plea offer and insist on going to trial under the circumstances.

¶ 68    The defendant also claims that he did not understand that the court would consider factors in aggravation at the sentencing hearing. However, he did not present any evidence in support of this claim. Moreover, Hopkins testified that he explained to the defendant how a sentencing hearing works, including the fact that the judge would consider factors in aggravation and mitigation. As noted earlier, Hopkins also testified that if a client did not understand anything, he took the time necessary to explain it more fully. It is also worth noting that the trial court explained during the plea hearing that at sentencing, the State would argue that the defendant should receive the maximum sentence and it would be up to defense counsel to argue that he should receive the minimum sentence. We find that the record does not support the defendant's bare allegation.

¶ 69    In addition, the defendant argues that he did not understand that he would be required to testify against his codefendants as part of the plea agreement. The only evidence to support this claim was the defendant's testimony that Hopkins told him that his testimony would not be

important because he was not a key witness. At the remand hearing, however, Hopkins denied telling the defendant he would not have to testify, and we note that the requirement that the defendant cooperate with prosecutors in the cases involving his codefendants was discussed multiple times at the plea hearing. Thus, we find no support in the record for the defendant's bare allegation that he was misled concerning this requirement. We conclude that the trial court did not abuse its discretion in denying the defendant's motion to withdraw his plea.

¶ 70                    B. Constitutional Challenge to the Defendant's Sentence

¶ 71    Next, the defendant argues that his sentence violated both the eighth amendment and the Illinois proportionate penalties clause as applied to him. We find that the record in this case is inadequate to allow us to resolve this claim.

¶ 72    The defendant's claim arises from the willingness of Illinois courts to extend the protections of *Miller v. Alabama*, 567 U.S. 460 (2012), to young adult defendants. In *Miller*, the United States Supreme Court held that imposing a sentence of natural life in prison without the possibility of parole for a crime committed by a juvenile violates the eighth amendment unless the sentencing court first considers the mitigating factors associated with youth. *Id.* at 479-80. The Court reasoned that juveniles have characteristics that make them both less culpable and more likely to be rehabilitated than adult defendants. *Id.* at 471. Although the Court recognized that these characteristics do not necessarily disappear when a person turns 18, the Court nevertheless drew that line at 18 for purposes of its holding. *Id.* at 465.

¶ 73    Illinois courts have expanded on the *Miller* holding in two important ways. First, the Illinois Supreme Court held that *Miller* applies to both actual sentences of natural life in prison and lengthy prison terms that constitute *de facto* life sentences. *People v. Buffer*, 2019 IL

23

122327, ¶ 27. The supreme court found that a sentence for a term of longer than 40 years constitutes a *de facto* life sentence. *Id.* ¶¶ 40-41.

¶ 74 Second, because the *Miller* Court relied, in part, on recent developments in the field of neuroscience showing that the human brain continues to develop beyond the age of 18 into the mid-20s (see *People v. House*, 2019 IL App (1st) 110580-B, ¶ 55 (citing Vincent Schiraldi & Bruce Western, *Why 21-Year-Old Offenders Should be Tried in Family Court*, Wash. Post (Oct. 2, 2015))), the Illinois Supreme Court has indicated that a young adult defendant may be able to show that imposing an actual or *de facto* life sentence on him without the protections afforded by *Miller* is unconstitutional as applied (see *People v. Harris*, 2018 IL 121932, ¶ 48; *People v. Thompson*, 2015 IL 118151, ¶ 44).

¶ 75 Significantly, however, the supreme court has stated that appellate review of an as-applied constitutional challenge to a young adult defendant's sentence is only possible if the record is adequate to allow the reviewing court to determine how these new findings in neuroscience apply to the defendant's circumstances. *Harris*, 2018 IL 121932, ¶ 46; *Thompson*, 2015 IL 118151, ¶ 38. The supreme court has provided little guidance in this area. See *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 34. However, several appellate court panels have framed the question as whether the defendant can establish that his brain was more like that of a juvenile than that of a fully developed adult when he committed his crime. See, *e.g.*, *People v. Ross*, 2020 IL App (1st) 171202, ¶ 26; *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14; *Daniels*, 2020 IL App (1st) 171738, ¶ 34. Relevant considerations include evidence that the defendant suffers from a mental illness that lowers his functional age (see *People v. Savage*, 2020 IL App (1st) 173135, ¶ 67; *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 64; *Bland*, 2020 IL App (3d) 170705,

24

¶ 14) or evidence that the defendant has struggled with drug or alcohol addiction (see *Ross*, 2020 IL App (1st) 171202, ¶ 26).

¶ 76   The record in this case does not contain the type of evidence Illinois appellate courts have found relevant to the crucial question of whether the defendant's brain was more like that of a juvenile than that of a fully-developed adult when he committed the murder. The defendant's youth-based sentencing challenge was raised for the first time by his fourth attorney after we remanded the case for full compliance with Rule 604(d), and her arguments on his behalf relied solely on studies showing that brain development continues through the mid-20s and the fact that the defendant was just one month past his eighteenth birthday when he participated in the botched robbery attempt that led to Ellis's death. We wish to emphasize that nearly all of the caselaw describing the parameters of the relevant inquiry was decided after the hearings in this case took place. As such, none of the defendant's attorneys had these cases available for guidance. However, this does not change the fact that the record before us is not adequately developed to allow us to address the defendant's claim.

¶ 77   The defendant, however, argues that the fact that he was 18 years and 1 month old when he committed the murder coupled with the fact that the robbery plan "bore all the hallmarks of youth" is adequate to demonstrate that the defendant was more like a juvenile than a fully-developed adult at the time. We disagree. Simply put, we are aware of no cases holding that a poorly-executed criminal plan is indicative of a juvenile-like brain. We therefore conclude that the record is inadequate to allow us to review the defendant's claim that *Miller* applies to him. We note that we express no opinion on the merits of his claim.

¶ 78                           C. Abuse of Discretion in Sentencing

¶ 79     Alternatively, the defendant argues that the court abused its discretion in imposing a lengthy sentence. He argues that his sentence was excessive in light of his youth and rehabilitative potential. We disagree.

¶ 80     The trial court enjoys substantial discretion to determine a defendant's sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Because the trial judge had the opportunity to observe the defendant during the proceedings, he was in a better position than we are to weigh the applicable factors. *Id.* at 212-13. We must therefore give great deference to his decision. *Id.* Accordingly, we will overturn the defendant's sentence only if we find an abuse of discretion. *Id*. Ordinarily, we will not find an abuse of discretion where the trial court considers the appropriate factors (*id.* at 213) and the sentence falls within the statutory range prescribed for the offense (*People v. Wilson*, 2016 IL App (1st) 141063, ¶ 12). However, the court's discretion is not unlimited, and we will find an abuse of discretion if the defendant's sentence is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 81     In this case, the record indicates that Judge Vaughan considered all applicable factors in aggravation and mitigation, and he imposed a sentence that is within the statutory range. We may not substitute our judgment for that of the trial court even if we would have weighed the factors differently or imposed a different sentence. See *Alexander*, 239 Ill. 2d at 213. For these reasons, we find no abuse of the court's discretion.

¶ 82                                 III. CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction and sentence.

¶ 83     Affirmed.

26